IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT MAUTHE, M.D., P.C., :
:
          Plaintiff, : CIVIL ACTION NO. 17-1643
:
v. :
:
OPTUM, INC. and OPTUMINSIGHT, INC., :
:
          Defendants. :

**MEMORANDUM OPINION**

Smith, J.                                                                                                     July 27, 2018

      The defendants maintain a national database of health care providers. The plaintiff is a health care provider. This case arises out of a facsimile ("fax") the defendants sent to the plaintiff to verify information in their database. After receiving this single-page fax, the plaintiff filed the instant lawsuit alleging that the fax was an unsolicited advertisement in violation of the Telephone Consumer Protection Act. The plaintiff also contends that the fax unlawfully converted his printer paper and toner.

      The parties have now engaged in limited discovery on the issue of whether the fax was an advertisement or a pretext for an advertisement, and the defendants have moved for summary judgment. Discovery has confirmed that the fax was neither an advertisement nor a pretext for an advertisement. The fax did not market the availability of a good or service, nor was it a pretext for a larger scheme to market the availability of a good or service. Accordingly, the court grants the motion for summary judgment on count I and declines to exercise jurisdiction over the pendant state law conversion claim.

# I. PROCEDURAL HISTORY

On April 11, 2017, the plaintiff, Dr. Robert Mauthe, filed a complaint alleging that the defendants, Optum, Inc. and Optum Insight, Inc. (collectively referred to as "Optum"), sent him an unsolicited fax that (1) violated the Telephone Consumer Protection Act ("TCPA") and (2) unlawfully converted his fax paper and printer toner. *See* Compl. at 9, 17, Doc. No. 1. Optum filed a motion to dismiss on June 15, 2017. Doc. No. 13. After the parties briefed the motion, the court granted the motion and dismissed the complaint because the fax "does not [on its face] advertise the commercial availability of any good or service . . . ." July 19, 2017 Order, Doc. No. 24.

On August 16, 2017, the plaintiff filed an amended complaint, which Optum moved to dismiss on August 22, 2017. Doc. Nos. 25, 28. The court denied this motion to dismiss without prejudice to Optum raising its arguments in a motion for summary judgment. *See* Oct. 17, 2017 Order, Doc. No. 33. In the order denying the motion to dismiss, the court also ordered the parties to perform limited discovery on the issue of whether Optum's "fax was an advertisement or a pretext, *i.e.*, whether it was part of a larger advertising scheme." *Id.* The parties concluded limited discovery on March 2, 2018. *See* Jan. 31, 2018 Stipulation and Order, Doc. No. 39.

On April 6, 2018, Optum filed a motion for summary judgment. Doc. No. 40. The plaintiff filed a response on April 23, 2018. Doc. No. 47. Optum filed a reply to the response to the motion on April 30, 2018. Doc. No. 50. The court heard oral argument on the motion for summary judgment on May 18, 2018, and the motion is now ripe for adjudication.

## III. DISCUSSION

### A. Standard of Review

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must examine the evidence presented in the light most favorable to the non-movant. *See Boyle v. Cty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

### B. Undisputed Facts

After reviewing the record, the court finds that there is no genuine dispute as to any material fact. The undisputed material facts are as follows: the plaintiff is a private health care provider. *See* Pl.'s Resp. to Defs.' Separate Statement of Undisputed Facts at ¶ 1 ("Pl.'s Statement"), Doc. No. 47-1. Optum runs a "national referential database of [health care] providers." Pl.'s Statement at ¶ 6; *see also* Eide Dep. at 16, Doc. No. 40-5. This national database "includes various data points about medical providers, including provider name, address, phone number, fax number, specialty, National Provider Identifier, medical school, and residency." Pl.'s Statement at ¶ 7. The database is usually "purchased and used by organizations that manage a health care network and pay claims, such as third-party payors or a third-party administrator." *Id.* at ¶ 8. "The organizations that purchase and use the Database typically have 5,000-plus providers in their network." *Id.* at ¶ 10 (internal quotation marks omitted). These organizations purchase the Database to, *inter alia*, "(a) correct[] inaccurate provider data in their directories, (b) identify[] potential providers to fill gaps in their networks, and (c) validat[e] provider information before paying a claim, such as an insurance claim." *Id.* at ¶ 11 (citations

omitted). "Optum does not market the Provider Database to individual provider offices."[1] Defs.' Separate Statement of Undisputed Facts at ¶ 12 ("Defs.' Statement"), Doc. No. 40-2.

In its efforts to update and verify the information in the database, Optum sends faxes to health care providers asking them to verify their information. *See* Pl.'s Statement at ¶¶ 16–18; *see* Bellis Dep. at 58–63. Optum sent one of these faxes to the plaintiff. *See* Am. Compl. at Ex. A; Bellis Dep. at 30–31. The single-page fax listed the contact information Optum currently has for the plaintiff and asked him to "[c]heck below if the data displayed is correct." Am. Compl. at Ex. A. If the data was wrong, the fax asked the plaintiff to "write the correct data in the space provided." *Id.* The fax also describes the Optum database and why the plaintiff is receiving the fax:

> As part of ongoing data maintenance of our Optum Provider Database product, Optum regularly contacts healthcare practitioners to verify demographic data regarding your office location(s). This outreach is independent of and not related to your participation in any Optum network. By taking a few minutes to verify your practice information is current, your information will be promptly updated in Optum Provider Database.
>
> This data is used by health care related organizations to aid in claims payment, assist with provider authentication and recruiting, augment their own provider data, mitigate healthcare fraud and publish accurate provider directories.

*Id.* As indicated above, discovery has confirmed the accuracy of these statements regarding the purpose of the fax and the nature of the database.

The fax also provides a link to a page on Optum's website. *See id.* The link is to a FAQ (frequently asked questions) page and is included on the fax to assist in answering any questions

---

[1] The plaintiff disputes this fact, *see* Pl.'s Statement at ¶ 12, but the dispute is not genuine. The plaintiff has pointed to no facts indicating that Optum markets the database to individual provider offices. *See id.* Optum, on the other hand, has provided extensive deposition testimony indicating that not only does Optum not market the database to individual providers, but there is not even a foreseeable reason for an individual provider to purchase the database. *See* Eide Dep. at 141 ("Q. Do you market the provider database to provider offices? A. We don't."); *id.* at 140 ("There is no use case that I can think of why an individual provider would purchase this data."); Bellis Dep. at 79 ("Q. Mr. Bellis, are you aware of whether Optum markets the provider database to provider offices? A. Not to my knowledge."), Doc. No. 40-6; *id.* ("Q. Is there any reason why a provider would ever want to purchase the provider database? A. No.").

health care providers may have regarding why they are receiving the fax and its purpose. *See id.*; *see also* Pl.'s Statement at ¶ 24. "The purpose of the FAQ is to provide answers to common questions from recipients of the fax." Pl.'s Statement at ¶ 24. The fax also states that if the plaintiff has questions or would like to opt out of future faxes, he can e-mail or call Optum (the fax provides both an e-mail address and a phone number). *See* Am. Compl. at Ex. A. Finally, the fax states that "[t]here is no cost to you to participate in this data maintenance initiative. This is not an attempt to sell you anything." *Id.* And discovery has confirmed that this fax was not an attempt to sell anything to the plaintiff. *See* Defs.' Statement at ¶ 12; Eide Dep. at 140–41; Bellis Dep. at 79.

### C. Analysis

The TCPA prohibits sending unsolicited advertisements "to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). Thus, the issue here is whether the fax sent to the plaintiff is an advertisement under the TCPA. The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods or services, which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). The FCC has interpreted this section of the TCPA and has taken a broad view of the meaning of "unsolicited advertisement." *See* FCC Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25967, 25973; *see, e.g.*, *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 466 (4th Cir. 2018) (applying FCC interpretation to hold fax offering free e-book was an unsolicited advertisement).

This court is bound by the FCC's interpretation. *See Carlton & Harris Chiropractic*, 883 F.3d at 466 (holding that district court was bound by FCC's interpretation). In a typical case

involving an agency's interpretation of a statute it administers, the court would evaluate the validity of the agency's interpretation under *Skidmore* or *Chevron*. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Here, unlike the typical case, "the Hobbs Act prevents the district court from considering the validity of final FCC orders." *Grind Lap Servs., Inc. v. UBM LLC*, No. CIV. A. 14-6448, 2015 WL 6955484, at *3 (N.D. Ill. Nov. 10, 2015) (citation and internal quotation marks omitted). Final FCC orders are only reviewable by "filing a petition in the court of appeals for the judicial circuit where the petitioner resides or has its principal office, or in the Court of Appeals for the D.C. Circuit." *Carlton*, 883 F.3d at 464. Because neither of the parties have challenged the FCC's rule in that manner, the court is bound by the FCC's interpretation to the extent that it covers the conduct in this case. *See id.*

Generally, there are two ways a fax can violate subsection 227(b)(1)(C) of the TCPA. First, a fax will violate the TCPA if, on its face, it promotes "the commercial availability or quality of any property, goods or services . . . ." 47 U.S.C. § 227(a)(5); *see Physicians Healthsource, Inc. v. Janssen Pharms., Inc.*, No. CIV. A. 12-2132, 2013 WL 486207, at *4–6 (D.N.J. Feb. 6, 2013). Second, even if a fax does not facially promote a good or service, it will nonetheless violate the TCPA if it is a pretext for a larger advertising scheme. *See, e.g.*, FCC Rules and Regulations, 71 Fed. Reg. at 25973 ("[S]urveys that serve as a pretext to an advertisement are subject to the TCPA's facsimile advertising rules.").

Additionally, under the FCC's interpretation any materials that promote or offer free services and products are "advertis[ements] [that promote] the commercial availability or quality of any property, goods or services . . . ."[2] 47 U.S.C. § 227(a)(5); *see* FCC Rules and

---

[2] There is disagreement in the federal courts regarding the scope of this rule. Specifically, some courts require plaintiffs to still prove that the fax has a "commercial nexus," whereas others have held that it is a de facto rule.

6

Regulations, 71 Fed. Reg. at 25973 ("[F]acsimile communications regarding [] free goods and services, if not purely 'transactional,' would require the sender to obtain the recipient's permission beforehand, in the absence of an EBR."); *see also Carlton*, 883 F.3d at 467–68. As the FCC Rule notes, "'free' publications are often part of an overall marketing campaign to sell property, goods, or services. . . . [W]hile the publication itself may be offered at no cost to the [facsimile] recipient, the products promoted within the publication are often commercially available." FCC Rules and Regulations, 71 Fed. Reg. at 25973. In other words, the FCC has determined that offers for free goods and services are so frequently "part of an overall marketing campaign to sell [something]," that the statute's purpose will be achieved by preemptively banning all offers for free goods and services. *See Carlton*, 883 F.3d at 468. Notably, if this rule were not in place, a plaintiff would have to show that the offer for a free good or service was a pretext for a larger, "overall marketing campaign to sell [something]." FCC Rules and Regulations, 71 Fed. Reg. at 25973.

For most other faxes, if they do not facially "advertis[e] the commercial availability or quality of any property, goods or services," 47 U.S.C. § 227(a)(5), they must be proven to be pretextual before TCPA liability can be imposed. *See* FCC Rules and Regulations, 71 Fed. Reg. at 25973. For example, the FCC contrasts faxes promoting free goods or services with informational communications and surveys. An informational communication is one that "contain[s] only information, such as industry news articles, legislative updates, or employee benefit information . . . ." *Id.* Unless they are pretextual, informational messages and surveys do not violate the TCPA. *See id.* (providing guidance on how to determine whether a fax "is a bona

---

*Compare Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017) (requiring the plaintiff to prove the existence of a commercial nexus before TCPA liability can be imposed), *with Carlton*, 883 F.3d at 467–68 (noting that the FCC has "declined to require such a fact-based inquiry").

7

fide 'informational communication'" and stating that "any surveys that serve as a pretext to an advertisement are subject to the TCPA's facsimile advertising rules").

In the instant case, the fax sent to the plaintiff was not (1) an offer to provide the database for free; (2) an offer to sell the database to the plaintiff or anyone else (*i.e.*, it was not an advertisement); or (3) a pretext to an overall scheme to sell the database to the plaintiff or anyone else. Undeterred, the plaintiff argues that "[f]axes sent in furtherance of indirect commercial solicitations or transactions with third parties are 'advertisements' within the meaning of the TCPA." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 5 ("Pl.'s Resp."), Doc. No. 47 (emphasis omitted). He contends that because Optum sends this fax to improve the quality of its database, *see id.* at 11, the fax is sent "in furtherance of . . . transactions with third parties . . .," *id.* at 5. This argument simply has no support in the law.

The TCPA only prohibits faxes "advertising the commercial availability or quality of any property, goods or services . . . ." 47 U.S.C. § 227(a)(5). This language does not prohibit faxes sent in furtherance of indirect commercial solicitations or transactions with third parties. Advertising is "'[t]he action of drawing the public's attention to something to promote its sale . . . .'" *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 221 (6th Cir. 2015) (quoting Black's Law Dictionary (10th ed. 2014)). Unless they promote the sale of an item by drawing public attention to it, faxes sent in furtherance of indirect commercial solicitations or transactions with third parties are not unsolicited advertisements. *See* 47 U.S.C. § 227(a)(5).

And while the FCC has taken considerable liberty in broadly interpreting the language chosen by Congress, it has stopped far short of the interpretation espoused by the plaintiff. The FCC's interpretation broadens the scope of TCPA liability to cover faxes promoting free goods

or services, but it says nothing about faxes that indirectly create commercial benefits.[3] In fact, many examples the FCC provides of faxes that do not fall within the scope of the TCPA, such as industry news articles, likely would fall within the scope of the TCPA if the court were to find that TCPA liability attached to any unsolicited fax sent by a business that could foreseeably further transactions with third parties.

Further, the plaintiff's argument is unsupported by the cases he cites. He relies heavily on *Carlton* for his proposed interpretation. *See* Pl.'s Resp. at 5–6. In *Carlton*, the defendants sent a fax to the plaintiff that offered "a free copy of the defendant[s'] e-book, *Physicians* [sic] *Desk Reference* . . . ." *Id.* at 6; *see Carlton*, 883 F.3d at 462–63. The court was faced with the question of whether the fax offering this free desk reference constituted an "unsolicited advertisement." *See Carlton*, 883 F.3d at 463. As noted above, the FCC rule specifically states that offers to provide free goods or services are "unsolicited advertisements." *See* FCC Rules and Regulations, 71 Fed. Reg. at 25973.

The district court was concerned about the scope of the FCC's rule. *See Carlton*, 883 F.3d at 466–68 (discussing district court's concern). TCPA liability typically requires that a fax both (1) promote something and (2) be of a commercial nature. *See id.*; *see also Sandusky Wellness Ctr.*, 788 F.3d at 222 ("[T]o be an ad, the fax must *promote* goods or services to be bought or sold . . . ." (emphasis added)); *Physicians Healthsource*, 2013 WL 486207, at *2 ("Congress intended that non-commercial faxes fall outside the TCPA's prohibition."). It was apparent that the fax promoted the free e-book, but the district court expressed concern that the FCC's blanket prohibition on faxes promoting free goods or services "would read *commercial* out of the TCPA's definition of unsolicited advertisement . . . ." *Carlton*, 883 F.3d at 468

---

[3] The interpretation frequently distinguishes between commercial and non-commercial faxes. *See* FCC Rules and Regulations, 71 Fed. Reg. at 25973. But it does not—and likely could not (for constitutional reasons)—impose a blanket ban on all commercial faxes. *See id.*

9

(citation and internal quotation marks omitted) (emphasis added). The Fourth Circuit indicated that the district court's apprehension was unwarranted because the defendant "receive[d] money from pharmaceutical companies whose drugs are listed in the *Physicians' Desk Reference*." *Id.* In light of this, it was possible that "the amount of money" the defendant "receives turns on how many copies of the *Physicians' Desk Reference* it distributes." *Id.* It was also possible that the defendant was incentivized to distribute e-books and that it was acting to "further its own economic interests" rather than provide a free service. *Id.*

The court's "further its own economic interests" statement was not a blanket holding that anytime a fax indirectly furthers the sender's own economic interests it violates the TCPA. *See id.* Rather, the court was indicating the fax was commercial in nature and that the commercial nexus aspect of TCPA liability was likely satisfied. *See id.* at 468–69. Yet, the plaintiff here argues that whenever a business sends a fax to "further its own economic interests" the fax is an "unsolicited advertisement" under *Carlton*. *See* Pl.'s Resp. at 5. This reading of *Carlton* is plainly incorrect. But even if it was not, the statement is contained in dicta and the decision is not binding on this court. Thus, the court would still decline to follow it.

The plaintiff also cites *Mussat v. Enclarity, Inc.*, No. CIV. A. 16-07643, 2018 WL 1156200 (N.D. Ill. Mar. 5, 2018), at length. *See* Pl.'s Resp. at 7. *Mussat* presents almost the exact same factual scenario as the case at hand. In that case, the district court denied a motion to dismiss because (1) the fax declared the commercial availability of the sender's services, and (2) it was foreseeable that the fax was a pretext for a larger advertising scheme. *Mussat*, 2018 WL 1156200, at *4. Despite its factual similarity, *Mussat* holds little persuasive value for the court's resolution of the instant motion.

For one, the case was resolved at the motion to dismiss stage and the defendant benefited from the generous, deferential 12(b)(6) standard. *See id.* at *1. Additionally, the court disagrees with *Mussat*'s formulation and application of the rule. The TCPA, as interpreted by the FCC, prohibits unsolicited faxes that advertise the commercial availability of goods or services. Advertise, as discussed above, is synonymous with "promote." *See Sandusky*, 788 F.3d at 222 ("[T]o be an ad, the fax must promote goods or services to be bought or sold . . . ."). But the district court in *Mussat* held that the plaintiff survived dismissal because "on its face, [the fax] *declares* the commercial availability of [the defendant's] services. The fax states that [the defendant] validates and updates health care provider contact information for its clients so that its clients can use the information or clinical summaries, prescription renewals, and other sensitive communications." *Mussat*, 2018 WL 1156200, at *4 (emphasis added). But for a fax to violate the TCPA it must do more than declare the commercial availability of a good or service—it must "promote" the availability of a good or service. *See Sandusky*, 788 F.3d at 222.

On pretext, *Mussat* is even less persuasive. Pretext is a fact-intensive inquiry. At the 12(b)(6) stage in *Mussat*, the plaintiff only needed to allege sufficient facts indicating that fax was plausibly pretextual. *See* 2018 WL 1156200, at *3. Here, the court can resolve the pretext issue on the merits rather than by simply reviewing the allegations in the amended complaint.

Additionally, in *Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*, No. CIV. A. 16-13777, 2017 WL 783499 (E.D. Mich. Mar. 1, 2017), the district court addressed the same fax at issue in *Mussat* and reached the opposite conclusion. *See* 2017 WL 783499, at *4–5. The district court granted the defendant's motion to dismiss and held that the fax did not constitute an unsolicited advertisement within the meaning of the TCPA.

In light of these reasons, the court rejects the plaintiff's argument that any fax that indirectly furthers a commercial transaction with a third party is an advertisement. Accordingly, the court will analyze whether the fax is an advertisement on its face, and if not, whether the fax is a pretext for an advertisement.

Turning to the facial analysis first, the fax listed the contact information Optum currently had for the plaintiff, and asked him to "[c]heck below if the data displayed is correct." Am. Compl. at Ex. A. If the data was wrong, the fax asked the plaintiff to "write the correct data in the space provided." *Id.* The fax also included a brief description of the Optum database and told the plaintiff why he was receiving the fax:

> As part of ongoing data maintenance of our Optum Provider Database product, Optum regularly contacts healthcare practitioners to verify demographic data regarding your office location(s). This outreach is independent of and not related to your participation in any Optum network. By taking a few minutes to verify your practice information is current, your information will be promptly updated in Optum Provider Database.
>
> The data is used by health care related organizations in claims payment, assist with provider authentication and recruit, augment their own provider data, mitigate healthcare fraud and publish accurate provider directories.

*Id.* The fax also provided a link to a FAQ page on Optum's website. *See id.* Additionally, the fax stated that if the plaintiff had questions or wanted to opt out of future faxes, he could e-mail or call Optum. *See id.* The fax provided both an e-mail and a phone number. *See id.* The fax also stated that "[t]here is no cost to you to participate in this data maintenance initiative. This is not an attempt to sell you anything." *See id.*

The court has previously determined that the fax is not an advertisement on its face. *See* July 19, 2017 Order, Doc. No. 24. There is no reason to depart from this prior determination:

> The fax at hand mentions Optum's database, but does not indicate that it is a product available for sale. . . . The fax does not express any intent to earn profit, receive payment, or sell anything. The fax at hand simply does not advertise the

> commercial availability of any good or service, and the fact that Optum could gain some ancillary commercial benefit is not enough to make the fax qualify as an advertisement.

*Id.* at 1 n.1 (citation omitted).

At most, the fax "declares" the availability of a good or service. However, as noted above, merely declaring the availability of a good or service is insufficient. The fax must "'draw[] the public's attention to something to promote its sale . . . .'" *Sandusky*, 788 F.3d at 221 (quoting Black's Law Dictionary (10th ed. 2014)). Here, the statements in the fax describing Optum's database do not draw the public's attention to it to promote its sale. *See* Am. Compl. at Ex. A. Rather, the fax provides the recipient with information about the database so that the recipient will understand why he or she is receiving the fax. *See id.* In sum, the fax was not an effort to promote the availability of the database nor was it an effort to sell the database to the plaintiff. *See* Def.'s Statement at ¶ 12; Eide Dep. at 140–41; Bellis Dep. at 79.

Because the fax is not facially an advertisement, the court must consider whether the fax was a pretext for a larger advertising scheme. The classic example of a pretext for an advertisement is a free seminar where the seminar is really just a chance for the defendant to "advertise commercial products and services." *Fulton,* 2017 WL 783499, at *2 (citation and internal quotation marks omitted). Similarly, offers for free publications (such as the ones prohibited by the FCC's interpretation) are often "part of an overall marketing campaign to sell property, goods, or services." FCC Rules and Regulations, 71 Fed. Reg. at 25973. Discovery, however, has shown that the fax here was not a pretext for a larger advertising scheme. Rather, the fax was exactly what it claimed to be on its face—a legitimate effort by Optum to verify the information in its database. *See* Pl.'s Statement at ¶¶ 16–18; Bellis Dep. at 58–63.

Nonetheless, the plaintiff argues that the fax was pretextual because the fax was

> sent as part of [defendant's] fax outreach verification program intended to gather information that would improve the accuracy and quality of their Database and related services, which Defendants not only then sell or license to third-party clients, but which Defendants market to such potential clients with express representations about Database accuracy and the fax outreach verification program that generates such accuracy.

Pl.'s Resp. at 18. This argument is the functional equivalent of the plaintiff's indirect future economic benefit argument. *See* Pl.'s Resp. at 5. As discussed above, this proposed rule is too broad; it is not supported by the language of the TCPA, the FCC's rule, or the relevant case law. That Optum will use this fax to improve the quality of its database does not transform the fax into an advertisement or make it pretextual. *See Physicians Healthsource*, 2013 WL 486207, at *4.

Additionally, the fact that the fax includes a link to Optum's FAQ page on its website does not make the fax pretextual. The FAQ link is informative, *i.e.*, it is included to provide additional information to the recipient of the fax so that he or she can fully understand why he or she is receiving the fax. *See* Pl.'s Statement at ¶¶ 22–25. It also provides an easy means for the recipient to find out how the information he or she gives to Optum will be used. *See id.* For these reasons, the court finds that the fax was not a pretext for an advertisement. Because the fax is neither an advertisement nor a pretext for an advertisement, the plaintiff's TCPA claim fails.

The only remaining claim is the plaintiff's state law conversion claim. *See* Am. Compl. at 18. In the Third Circuit, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000). Here, the parties have only taken discovery on the issue of whether the fax was a pretext.

*See* Oct. 17, 2017 Order, Doc. No. 33.  Accordingly, the court finds that there is no affirmative justification warranting the court to exercise supplemental jurisdiction over this additional claim.

## IV.     CONCLUSION

The TCPA prohibits unsolicited fax advertisements.  The fax at issue in this case is neither an advertisement on its face nor a pretext for an overall marketing scheme.  Rather, the fax was a genuine effort to gather and verify information for Optum's health care provider database.  Accordingly, the court grants the motion for summary judgment on Count I of the amended complaint and will dismiss without prejudice Count II of the amended complaint.

The court will issue a separate order.


BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.